Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Frieda K. Zimmerman
Dan Fruchter
Molly M.S. Smith
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA
*ex rel.* Bradley D. Keever, Relator,

Plaintiffs,

v.

HANFORD MISSION
INTEGRATION SOLUTIONS, LLC;

Defendant.

No. 4:21-CV-05156-SAB

UNITED STATES' COMPLAINT IN INTERVENTION

## UNITED STATES' COMPLAINT IN INTERVENTION

The United States of America, for its complaint, alleges as follows:

1.      This is a civil action by the United States of America to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, and for damages for the common law claim of breach of contract arising from Defendant's use and submittal of false and fraudulent claims and statements to the

UNITED STATES' COMPLAINT IN INTERVENTION - 1

United States by knowingly engaging in systemic and fraudulent overstatement of labor hours for critical fire protection work at the Department of Energy's Hanford Nuclear Site.

2.    Between August 17, 2020, and the present, Defendant Hanford Mission Integration Solutions, LLC ("HMIS") and its employees knowingly participated in a fraudulent scheme to falsely claim and receive payment from the United States for unworked hours by knowingly and systemically creating and using false records and statements designed to enrich themselves at the expense of the public fisc.

3.    Defendant and its employees, managers, and supervisors, knew of these fraudulent practices and false statements and nonetheless accepted, condoned, and used them to increase their own earnings. Defendant's knowing and fraudulent conduct resulted in the loss of many millions of dollars to the United States, while jeopardizing the safety of Hanford Site workers, the public, and the environment by failing to effectively use public dollars to perform critical fire protection work.

## I.    JURISTICTION AND VENUE

4.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733, and common law. This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345, and 1355.

5.    This Court has personal jurisdiction over Defendant because

UNITED STATES' COMPLAINT IN INTERVENTION - 2

Defendant conducted business in the Eastern District of Washington, because Defendant made and used false statements from within and to a federal agency located in the Eastern District of Washington, and because many of the prohibited acts committed by Defendant occurred within the Eastern District of Washington.

6.      Venue is proper in the Eastern District of Washington under 28 U.S.C. §§ 1391(b) and (c) and 1395, and under 31 U.S.C. § 3732(a).  Defendant can be found and transacts business within the Eastern District of Washington, and many of the acts committed by Defendant proscribed by the False Claims Act occurred within the Eastern District of Washington.

## II.    **THE PARTIES**

7.      The Plaintiff in this action is the United States of America.

8.      The United States Department of Energy ("DOE") is a cabinet-level executive agency of the United States headquartered in Washington, D.C.  The DOE's mission is to ensure the United States' security and prosperity by addressing its energy, environmental, and nuclear challenges through science and technology. The DOE is also responsible for the management, environmental restoration, and remediation of the United States' legacy nuclear weapons production facilities, and the legacy waste generated from those facilities, in a manner protective of public and environmental health.

9.      Defendant Hanford Mission Integration Solutions, LLC ("HMIS") is a

UNITED STATES' COMPLAINT IN INTERVENTION - 3

Delaware limited liability company with a principal place of business in Richland, Washington.  HMIS is comprised of three entities: Leidos Integrated Technology, LLC ("LIT"), Centerra Group, LLC ("Centerra"), and Parsons Government Services Inc. ("Parsons"). HMIS was created by these entities for the purposes of bidding on, and performing, the Hanford Mission Essential Services Contract (sometimes abbreviated as HMESC, hereinafter "the Contract"), a multi-billion dollar DOE prime contract at the Hanford Site.

10.    The relator, Bradley Keever, has been employed at the Hanford Site since 2009 and in Fire Systems Maintenance specifically since 2017. Mr. Keever has been employed by HMIS since HMIS began performance of the Contract.

## III.    RELEVANT STATUTORY AND REGULATORY BACKGROUND

### a. The False Claims Act

11.    Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act, 31 U.S.C. §§ 3729-3733, is the primary tool with which the United States combats fraud against the Government and protects the federal fisc.  The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White*, 390 U.S. 228, 232 (1968).

12.    The False Claims Act provides that a person is liable to the United

UNITED STATES' COMPLAINT IN INTERVENTION - 4

States Government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

13.     The False Claims Act further imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).

14.     The False Claims Act defines "knowingly" to mean that a person, with respect to information, "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information" and further provides that no proof of specific intent to defraud is required.  31 U.S.C. § 3729(b).

15.     The False Claims Act provides that a person is liable to the United States for three times the amount of damages the United States sustains because of the act of that person, plus additional civil penalties for each violation. 31 U.S.C. § 3729(a)(1).

### b. The Federal Acquisition Regulation

16.     The Federal Acquisition Regulation (FAR), 48 C.F.R. Part 1, requires, in relevant part, that "Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none.  Transactions relating to the

expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct." 48 C.F.R. § 3.101-1.

17.    Reimbursement of costs incurred by HMIS under the Contract are governed by Federal Acquisition Regulation (FAR) 52.216-7[1] and the cost principles found in FAR Subpart 31.2.[2]  Under these principles, a contractor such as HMIS can claim reimbursement only for those costs incurred in furtherance of the scope of work under the contract, provided that the costs were reasonable, allocable, and allowable.  Additionally, contractors like HMIS are responsible for maintaining adequate supporting documentation to determine the reasonableness, allocability, and allowability of the costs, as well as compliance with the cost principles.  With respect to labor costs attributable to hourly employees, only costs associated with labor hours actually performed by HMIS employees were reimbursable under the Contract, except in narrow situations not applicable here.

18.    Additionally, under FAR 52.232-25 (Section I.120 of the HMIS Contract)[3], if a contractor becomes aware of a duplicate contract financing or invoice payment or that the Government has otherwise overpaid on a contract financing or invoice payment, the contractor must remit the overpayment and

---

[1] Contract No. 89303320DEM000031, Table I-1 at I.171, Allowable Costs and Payment.

[2] *Id.*, Table I-1 at I.171, Allowable Costs and Payment.

[3] *Id.*, Table I-1 at I.120, Prompt Payment.

UNITED STATES' COMPLAINT IN INTERVENTION - 6

provide supporting information concerning the overpayment.

## IV.    BACKGROUND: THE HANFORD SITE

19.    The Hanford Site is a 580 square-mile Department of Energy site in the Eastern District of Washington.  The Hanford Site is a mostly decommissioned nuclear production complex that has been operating since the 1940s.  Established in 1943 as part of the Manhattan Project in the town of Hanford in south-central Washington, the site was home to the B Reactor, the first full-scale plutonium production reactor in the world.  Plutonium manufactured at the Hanford Site was used in the first nuclear bomb tested at the Trinity site in New Mexico, and in Fat Man, the atomic plutonium bomb detonated over Nagasaki, Japan.  During the Cold War, the project was expanded to include nine nuclear reactors and five large plutonium processing complexes, which produced plutonium for most of the 60,000 weapons in the United States' nuclear arsenal.  The Hanford Site currently houses approximately two-thirds of the United States' high-level radioactive waste by volume.  The DOE's Richland Operations Office and the Office of River Protection (ORP), both located in Richland, Washington, in the Eastern District of Washington, oversee and manage the Hanford Site.

20.    Over fifty million gallons of mixed radioactive and hazardous waste at Hanford are stored in 177 large underground storage tanks. Many of these original "single-shell" storage tanks have long since passed their originally expected

lifespans and can no longer be relied upon. Sixty-seven of the tanks have or are suspected to have leaked up to one million gallons of waste. Releases from some tanks have reached groundwater. Unless action is taken to protect the surrounding area, additional contamination of groundwater and the adjacent Columbia River will result. Thus, remediation of this waste by retrieving the waste from the single-shell tanks, placing it in more robust storage tanks, and treating the waste to form more stable forms, is of high priority.

21.    DOE is responsible for oversight of the retrieval, treatment, and disposal of the millions of gallons of high-level nuclear waste, construction of a Waste Treatment and Immobilization Plant to process and immobilize the waste, and most or all associated operations, engineering, and construction activities. DOE prime contractors overseen by ORP and RL carry out extensive work to clean up and remediate the site, and protect workers, the public, and the environment from the associated radiological and other hazards. This is the nation's largest and most complex environmental remediation project.

22.    As part of these efforts, DOE employs personnel at multiple offices located in Richland, Washington, and contracts with numerous contractors employing thousands of workers involved in the cleanup efforts.

### Hanford Mission Essential Services Contract ("the Contract")

23.    At the Hanford Site, the Department of Energy retains contractors for

UNITED STATES' COMPLAINT IN INTERVENTION - 8

"Mission Support" or "Mission Essential Services" to conduct cost-effective infrastructure and site services which are integral and necessary to accomplish the environmental cleanup mission.

24.    This support, including logistical support, training, occupational health, information technology, site security, and the like, is essential to the success of the Hanford Site cleanup mission from an operational, safety, and security standpoint.

25.    From 2009 to early 2021, the contract for mission support at the Hanford Site was held by Mission Support Alliance, LLC ("MSA"). The Mission Support Contract, Contract No. DE-AC06- 09RL14728 ("MS Contract"), was a five-year base period with options to extend past the initial base period.

26.    The MS Contract was extended beyond the initial base period several times and ultimately remained in effect until January 25, 2021, which included a transition period to HMIS.

27.    On or about August 17, 2020, MSA and HMIS began a 120-day contract transition from infrastructure and site services provided by MSA under the MS Contract to services provided by HMIS under the Hanford Mission Essential Services Contract, Contract No. 89303320DEM000031 ("the Contract"), to provide direct support to DOE and its contractors with cost-effective infrastructure and site services integral and necessary to accomplish the environmental cleanup mission at

the Hanford Site.

28.    The Contract is a "performance-based Contract" that includes several different types of payment provisions: "Cost Reimbursement (CR) (non-fee bearing), Cost-Plus-Award-Fee (CPAF), and Indefinite Delivery/Indefinite Quantity (IDIQ) Contract Line Item Numbers (CLIN)."[4] The total estimated value of the Contract is $3,984,698,075.31.

29.    The Contract includes eight primary CLINs: 1) Contract Transition, 2) Hanford Site Benefit Plans, 3) Legacy Benefit Plans and Legacy Workers' Compensation, 4) Infrastructure and Site Services General Requirements, 5) DOE Small Business Procurement Pre-Award Support, 6) Usage-Based Services to be Provided to Other Hanford Contractors (OHC), 7) Infrastructure Reliability Projects, and 8) DOE Small Business Procurement Post-Award Support and Other Directed Work Scope.

30.    CLIN 4, Infrastructure and Site Services, is a broad category that includes "activities such as utilities (electrical and energy management, water, and sewer), sanitary waste disposal, roads and grounds, and railroad services."[5] The Contract requires that HMIS "develop and implement an integrated life cycle approach to furnish, operate, maintain, and close infrastructure supporting the

---

[4] Contract No. 89303320DEM000031, § B.2.
[5] *Id.,* § C.4.
UNITED STATES' COMPLAINT IN INTERVENTION - 10

Hanford Site mission, based on necessary and sufficient user requirements."[6] Additionally, HMIS "shall maintain services and equipment required to support the Hanford Site environmental cleanup mission and ensure safe, compliant, cost-effective, and energy-efficient alignment with projects that are integral to the Hanford Site mission."[7]

31.     CLIN 4, Infrastructure and Site Services, also includes Fire and Emergency Response Services. Pursuant to the Fire and Emergency Response Services section of the Contract, HMIS shall:

> Provide fire emergency response services, including fire prevention, fire suppression, and fire investigations; emergency rescue; emergency medical service and patient transport; incident command; and hazardous materials and chemical/biological/radiological emergency response (to include decontamination) for the Hanford Site. Ensure 24/7 fire and emergency services-related protection of human life, property, and facilities, operate basic and advanced life support emergency medical services.[8]

32.     Real Property Asset Management also falls under CLIN 4, Infrastructure and Site Services. This includes Fire Systems Maintenance, which requires HMIS to provide "fire protection system inspection, testing, and maintenance (IT&M) of existing and new fires systems."[9]

33.     Work performed under CLIN 4, Infrastructure and Site Services, is

---

[6] *Id.,* § C.4.
[7] *Id.,* § C.4.
[8] Contract No. 89303320DEM000031, § C.4.4.1.
[9] *Id.*, § C.4.8.2.

UNITED STATES' COMPLAINT IN INTERVENTION - 11

subject to the Cost-Plus-Award-Fee payment provision.[10] This type of contractual payment provision is a cost-reimbursement provision that also provides for a fee consisting of a base amount fixed an inception of the contract, and an award amount based on the Government's evaluation of performance under the contract.  For work performed under CLIN 4, HMIS would be reimbursed for all costs incurred in performing the contract, including the fully burdened costs of all employees performing on the Contract, so long as those costs are allowable under the Contract and its terms, allocable to the Contract, and reasonable.

34.    The Contract requires HMIS to use Standard Form 1034 when requesting payment for work performed under the Contract.[11] HMIS must use the Vender Inquiry Payment Electronic Reporting System ("VIPERS") to submit vouchers, or invoices, regarding the claimed costs, including direct labor costs. The Contract requires that each invoice be accompanied by a Statement of Cost completed and consistent with data in HMIS' cost accounting system. Additionally, under the Contract, the costs claimed "must be only those recorded costs authorized for billing by the payment provisions of the contract."[12] For direct costs, such as labor, HMIS is required to provide adequate support for the costs claimed for reimbursement on the Statement of Cost, and clearly indicate where the funds were

---

[10] *Id.*, § B.2.
[11] *Id.,* § G, G.5, G-3.
[12] *Id.,* § G, G.5, G-4.

UNITED STATES' COMPLAINT IN INTERVENTION - 12

expended. Through these invoices, HMIS, as required, itemized, and justified its costs, including labor and overtime costs, claimed from DOE.

35.     Under the Contract, LIT, Centerra, and Parsons, the parent companies of HMIS, guarantee HMIS' performance and assume all liabilities incurred by HMIS in connection with the Contract.[13]

### Fire Systems Maintenance

36.     Under the Contract, HMIS: "shall perform required fire protection systems inspections, testing, and maintenance on facilities assigned to it under this Contract" and "perform functional IT&M [inspection, testing, and maintenance] of life safety and property fire protection systems (including backflow prevention devices) in facilities identified for this Contract."[14] To that end, the Fire Systems Maintenance ("FSM") unit provides fire protection system inspection, testing, and maintenance ("IT&M") for existing and new fires systems at the Hanford Site.

37.     There are approximately 427 facilities on site with operating fire protection systems. Functional testing within these facilities encompasses approximately 13,800 fire protection device tests with more than 8,000 fire extinguishers annually. There are four fire stations on-site servicing approximately 580 square miles of the Hanford Site.

---

[13] *Id.,* Attachment J-5.
[14] *Id.*, § C.4.8.2.

38.    Fully functional and well-maintained fire suppression systems are critical to protecting workers, public health, government property, and the environment from potentially catastrophic incidents during the clean-up mission at the Hanford Site. Depending on the building or structure, prompt and effective fire suppression could be critical to protecting against injury, loss of life, and property or equipment damage.

39.    If fire suppression systems are not opened and inspected on a regular basis, rust, debris, and microbiologically induced sludge and slime could be present and could cause overall failures, blockages, or pressure reductions in all these systems.

40.    The standard setting organization for the installation, maintenance, and testing of fire suppression/control systems is the National Fire Protection Association (NFPA).  The Contract and various regulatory standards require that the fire suppression systems at Hanford be inspected, maintained, and tested in accordance with NFPA requirements.

41.    In the Fire Systems Maintenance organization ("FSM"), the required inspection, testing, and maintenance work is assigned primarily to Pipefitters and Electricians (collectively, "craft employees"), who are supervised on shift by Field Work Supervisors ("FWS"). All of these individuals work under the Maintenance Manager for Fire Systems Maintenance. Pipefitters, Electricians, and Field Work

UNITED STATES' COMPLAINT IN INTERVENTION - 14

Supervisors generally work 10-hour shifts, four days a week, Monday – Thursday.

42.    FSM craft employees typically clock in around 6 a.m., and attend a morning meeting near the beginning of their shift where work is assigned. FSM craft employees have a lunch break from 11:00 a.m. to 11:30 a.m. daily, and typically clock out around 4:30 p.m. Many jobs assigned to FSM craft employees require support from firefighters (who are also HMIS employees) or facility-specific personnel.

43.    Each week, a HMIS scheduler prepares a "FSM Plan of the Week" document that outlines the expected work. With some limited exceptions, FSM craft personnel typically perform the majority of their work according to particular work packages as determined by HMIS. These work packages, created by work planners, allow HMIS to track work as it is performed. Documentation for work packages includes information about the project such as the location, components required, resources needed, as well as forms for tracking all stages of the package, from the initial required reviews and/or approvals of the package to documentation of package completion and post-work review. A Work Record form is used to track the dates of work performed, and includes a description of the action as well as the name of the employee(s), type of worker, and hours expended. Additionally, work packages include the applicable procedures to be followed, as well as detailed, step-by-step instructions for the job to be performed.

UNITED STATES' COMPLAINT IN INTERVENTION - 15

44.     The purpose of the Plan of the Week ("POW") is to "lockdown" the schedule for the upcoming week.[15] POWs include the anticipated work packages as well as any planned training, leave, or other assignments. All work packages included in a finalized POW should have a status of "ready to work."[16] The Maintenance Manager is responsible for ensuring that the POW scheduler is provided with the labor resources available to schedule for each week, as well as validating that the labor resources on the Priority Lists are accurate and can support scheduled work for each day. [17]

45.     The POW is also used to create a daily FSM IT & M Priority List detailing the expected assignments, which is provided to craft employees at the morning meeting.  However, it is not uncommon for work packages on the Priority List to not proceed as scheduled, due to availability of parts, lack of firefighter support, or various other planning issues.

46.     Craft employees in FSM record the majority of their time via work packages, which are generally categorized as preventative or corrective. Preventative work packages generally are charged under cost account charge number (CACN) 600320, while the CACN for FSM corrective maintenance is CACN 600319. For training, the CACN is 600318. On occasion, FSM employees

---

[15] MCS-PRO-FS-61160, pg. 5.
[16] *Id.*
[17] *Id.*  at pg. 1.

UNITED STATES' COMPLAINT IN INTERVENTION - 16

will perform support for other Hanford contractors, and bill to their codes. Managers are responsible for directing employees to the HMIS Work Charging Authorization (HLANWCA) and providing guidance on how to record the work performed and time spent working.

47.    During the time period relevant to this Complaint, FSM hourly employees were paid weekly, based on the number of labor hours entered into an electronic system known as the Time Information System ("TIS"). Pursuant to the applicable written procedures, FSM hourly employees were required to input their time worked into TIS on a daily basis.[18]  In addition to requiring that employees record their start and end times for each day, FSM hourly employees were required to accurately enter the HMIS cost account charge number (CACN) for each project worked on during the day, as well as the number of hours worked associated with each CACN. HMIS written procedures required that FSM hourly employees record time in increments of six minutes, where working the first through the third minute results in rounding down, and working the fourth through the sixth minute results in rounding up.[19]  HMIS written procedures also required that managers provide guidance to ensure all labor charging is accurate to the work performed and time spent working.[20]

---

[18] HMIS-PRO-FA-045, pg. 6.
[19] HMIS-PRO-FA-045, pg. 14.
[20] *Id.,* pg. 3.

UNITED STATES' COMPLAINT IN INTERVENTION - 17

48.    Pursuant to HMIS written procedures, in order to be paid, each employee was required to electronically submit the completed weekly information (referred to herein as a timecard), including the time that the employee began and ended work on each day in the pay period, to the employee's direct supervisor.[21] Employees were required to submit timecards for approval at end of shift on the last workday of the week, or earlier if directed by payroll.[22] Per HMIS procedures, in order to be paid, the hourly employee's direct supervisor, or another authorized HMIS employee, was required to electronically approve and submit the employee's timecard by 9:00 a.m. Monday morning of the following week, unless otherwise directed by payroll.[23] This review and approval process required supervisors to review timecards for completeness and verify charging authorization for CACNs recorded via the HLANWCA.[24]

49.    Once a timecard was approved by a supervisory HMIS employee, the information contained in that timecard populated to the HMIS accounting system, and HMIS then incorporated that information into invoices submitted to DOE, requesting payment from DOE for the fully-burdened labor cost associated with that employee's time card. Under the Contract, only hours actually worked were

---

[21] *Id.,* pg. 9.
[22] *Id.,* pg. 7.
[23] *Id.,* pg. 11.
[24] *Id.*

UNITED STATES' COMPLAINT IN INTERVENTION - 18

reasonable, allocable, and allowable costs that were eligible to be reimbursed by DOE.

50.     In addition to their regular working hours, HMIS hourly employees were eligible for overtime paid at premium rates.  Like other direct labor costs, HMIS was entitled to reimbursement for its incurred costs associated with overtime, but only for overtime hours actually worked by an overtime-eligible employee in furtherance of the Contract.  Moreover, the Contract required HMIS to maintain adequate internal controls to ensure that employee overtime was used and charged only as necessary, appropriate, and cost effective.  Like regular working hours, overtime hours were required to be accurately entered into TIS by the hourly employee, submitted to the hourly employee's immediate supervisor, reviewed, approved, and validated by the supervisor, and then would be used to populate HMIS' invoice to DOE.

51.     HMIS written procedures related to labor charging in effect during the relevant time period stated that "[t]imecards are HMIS business records and must represent actual compensated work performed clearly and accurately."[25]  HMIS written procedures further provided and acknowledged that by submitting a timecard in TIS for approval by a supervisor, an employee was certifying that the information is true and correct.

---

[25] HMIS-PRO-FA-045; *see also,* MSC-PRO-FA-045.

UNITED STATES' COMPLAINT IN INTERVENTION - 19

52.     HMIS's procedures further stated and acknowledged that "[m]anagers should ensure employees understand their work assignments and the associated charge numbers and know how to record compensated time on a daily basis to the projects on which they worked, regardless of how their time was budgeted or planned."[26] Under the applicable written procedures, managers were responsible for providing guidance to ensure all labor charging was accurate to the actual work performed and time spent working.

53.     HMIS written procedures also stated and acknowledged that, due to the cost reimbursement nature of the Contract, entering false information into a timecard constituted fraud on the United States and was a violation of federal criminal law. HMIS written procedures specifically state:

> All employees should be aware that falsifying his/her timecard is a federal crime under both the Federal False Claims Act (31 USC 3729) and the False Statements Accountability Act of 1996 (18 USC1001). Under the False Claims Act any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (a request or demand that will be paid under contract by the Government) is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 plus three times the amount of damages that the Government sustains because of the act of that person. The crime is complete when the statement is made, and the claim is presented to the Government for payment.

[26] HMIS-PRO-FA-045.

UNITED STATES' COMPLAINT IN INTERVENTION - 20

## V.    BETWEEN AUGUST 17, 2020, AND THE PRESENT, HMIS REGULARLY, REPEATEDLY, AND KNOWINGLY CLAIMED PAYMENT FOR LABOR HOURS NOT WORKED BY ITS HOURLY EMPLOYEES

54.    Between August 17, 2020, and the present, HMIS regularly, repeatedly, and knowingly sought and received payment for labor hours not worked by HMIS hourly employees in the Fire Systems Maintenance unit in the invoices and requests for payment that HMIS submitted to DOE, and the labor information maintained by HMIS in support thereof.

55.    During the relevant time period, HMIS' written procedures explicitly required that employees accurately record their actual work performed, both for regular hours and overtime hours.  For example, one such procedure stated:

> Labor costs are a substantial portion of the total expenses for HMIS each year, and consequently, time recording is, and will continue to be, under intense scrutiny by Internal Audit, the [DOE] Office of the Inspector General (OIG), the Defense Contract Audit Agency (DCAA), and by the Department of Energy (DOE).  Timecards are HMIS business records and <u>must represent actual compensated work performed</u> clearly and accurately. The recording of time into the TIS system is an essential part of the company's accounting system.[27]

(emphasis supplied).

56.    HMIS' procedure also provided that "[a]ll employees should be aware that falsifying your timecard is a federal crime. . . Falsification of time cards is a deliberate action intended to defraud the government, not an honest mistake."[28]

---

[27] HMIS-PRO-FA-045, pg. 2; Identical language appears in the prior MSA procedure on Labor Charging, MSC-PRO-FA-045.
[28] *Id.* at 2, 3.

UNITED STATES' COMPLAINT IN INTERVENTION - 21

57.    Contrary to the HMIS written procedures, however, between August 17, 2020, and the present, HMIS and its employees, supervisors, and managers regularly engaged in a systemic fraudulent timecard scheme designed to fleece the DOE for their own benefit.

58.    Between August 17, 2020, and the present, due to HMIS's failure to appropriately plan and schedule fire protection work for its hourly employees to do, it was customary, accepted, and daily practice for HMIS hourly employees in the Fire Systems Maintenance unit to experience significant idle time, during which they had no work to perform, and to nonetheless falsely record their full shifts to active charge codes on their timecards, falsely and fraudulently indicating that these hourly employees had performed work that they had not performed, in order to seek and obtain reimbursement from DOE for the idle hours. These timecards, containing false statements and representations, were approved by supervisory HMIS employees who were or should have been aware that the timecards did not accurately reflect the work performed because of the extensive and unreasonable amount of idle time experienced by hourly workers on a daily or near daily basis.

59.    During this timeframe, HMIS craft personnel, including the pipefitters and electricians responsible for fire systems maintenance at facilities across the entire Hanford Site, frequently experienced significant idle time, where they had no work to perform. Several factors within the control of HMIS contributed to this idle

time, including insufficient work packages scheduled, scheduled work packages not actually being ready to work, issues with parts availability, and insufficient firefighter support resources.

60.    HMIS supervisors and management specifically directed hourly employees to falsely and fraudulently bill to active charge codes corresponding to various tasks and projects for the large blocks of idle time they experienced, as though work had been performed. Often, supervisory employees instructed hourly employees to record their down time under the last job completed, or a training code sometimes used as a "catch-all."

61.    For example, if, during a 10-hour work day, a craft employee worked one job for preventative maintenance ("PM") that took only 2 hours, HMIS management and supervisors directed the craft employee to bill the entire day to the "PM" code, CACN 600320. This practice misrepresented to DOE that work was being performed, when in fact, hourly employees experienced significant idle time which was not a reimbursable cost under the Contract, and worked for only a small portion of the labor time that HMIS was falsely and fraudulently charging to DOE.

62.    Due to HMIS management's failure to plan, schedule, and carry out work effectively, the idle time experienced by hourly employees was significant and pervasive. Often, hourly employees worked only a fraction of their full shifts, and were idle for several hours every day, frequently a majority of the day. In order

to fill their idle time, hourly employees would read, watch movies or television shows, and on occasion take naps.

63.    HMIS managers, tasked with review and approval of HMIS timecards that are used to populate and create the HMIS invoices submitted to DOE, routinely approved timecards that billed to active charge codes for a full shift, despite having knowledge of the pervasive and widespread idle time experienced by craft workers. HMIS then billed DOE for all labor charges recorded on timecards, including time not actually worked.

64.    HMIS managers not only accepted and condoned the entry of false time entries, they actively facilitated it. Hourly employees received instruction from supervisors and management, including Field Work Supervisors, Maintenance Managers, and the Director of Fire Systems Maintenance, to bill idle time on their shift to active charge codes.  HMIS management knew that craft personnel were not consistently productively engaged for a full day of work, and that the work being planned and scheduled was insufficient to keep craft personnel occupied throughout the day.

<u>Specific Examples of HMIS Time Charging Fraud and Management Knowledge Thereof</u>

<u>*March 2021*</u>

65.    By way of example, in March of 2021, a pipefitter requested guidance from then Fire Systems Maintenance Manager Jeff McBroom on what charge code

UNITED STATES' COMPLAINT IN INTERVENTION - 24

to use when they had finished a job and were waiting at their desk, or if they did not have a current job assignment. Mr. McBroom provided the following via email:

> "1. If you are performing PMs as your job assignment – they used that charge code for **the day**. 2. If you are performing CMs as your job assignment – they used that charge code for **the day**. … 4. If they DID NOT have a job assignment for the day – that means you are on standby and would use the 600318."

CACN 600318 is the CACN for training.

_March 30, 2022_

66.    By way of example, on March 30, 2022, two FSM electricians (identified on work records as Craft/Resource Type 22F) worked two Domestic Backflow packages on that day's Priority List: FP-22-01655 and FP-22-01656. Neither electrician was scheduled to work on any other work packages that day.

67.    The documentation for each work package states that the electricians spent two hours on each package.

FP-22-01655:

| WORK RECORD | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 1. Document Number: FP-22-01655 | | |
| 2. Work Item Title: Provide HFD Support for an Electrical Outage at 272-AW | | | | | | |
| Date | Turnover, Problem Description, Action Taken | Feed-Back (X) | Print First and Last Name | Craft/Resource Type | Hours |
| 3/30/22 | Task 1 complete. | | ██████████ | R M | 1 |
| | | | ██████████ | 2 2F | 2 |

UNITED STATES' COMPLAINT IN INTERVENTION - 25

FP-22-01656:

| | | | | | | |
|---|---|---|---|---|---|---|
| **WORK RECORD** | | | | | | |
| | | | | 1. Document Number: FP-22-01655 | | |
| 2. Work Item Title: Provide HFD Support for an Electrical Outage at 272-AW | | | | | | |
| Date | Turnover, Problem Description, Action Taken | Feed-Back (X) | Print First and Last Name | Craft/Resource Type | Hours | |
| 3/30/22 | Task 1 complete. Batteries from RFAR and PACU were removed and are stored in RM/electricians shops. Will need on restoration. on 3/30/22 | | █████████ | Rm | 1 | |
| | | | | 4 IE | 2 | |
| | | | | 22P | 2 | |
| | | | | fug | | |

68.     A review of the other work packages scheduled for March 30, 2022, indicates that neither electrician worked on any other work package. Thus, the work package documentation indicates that each electrician worked 4 hours March 30, 2022. However, the notes included in the detailed work steps for each package indicate that work record hours are also inflated.

69.     For FP-22-01656, the work steps indicate the package concluded around 9 a.m.

6.3    **NOTIFY** HFD dispatch of the anticipated outage duration.

6.4    **RECORD** date and time RFAR 2390 is disabled.

DATE: 3/30/22    TIME: 0900

UNITED STATES' COMPLAINT IN INTERVENTION - 26

70.    For FP-22-01655, the work steps indicate the package concluded less than 15 minutes later.

- **NOTIFY** HFD dispatch of the anticipated outage duration.
- **RECORD** date and time RFAR 2310 is disabled.

DATE: 3/30/22           TIME: 0914

71.    When these two work packages are reviewed in combination, it appears FP-22-01655 took less than 15 minutes, rather than the two hours indicated on the Work Record.

72.    These two electricians are not listed in any other work packages on the Priority List for March 30, 2022. The work package documentation suggests that the work they did perform was complete a little over three hours into their 10-hour shifts. Nonetheless, each electrician recorded a full 10 hours on their timecard for that day.

*May 25, 2022*

73.    For an additional example, the FSM IT&M Priority List for May 25, 2022, identified five work packages. Two of those packages, FP-20-00048 and FP-21-03036, did not require any work be performed by pipefitters or electricians. The three remaining work packages were insufficient to occupy the time of the assigned craft, resulting in idle time.

74.    Even more troubling, five of the nine pipefitters working that day did

UNITED STATES' COMPLAINT IN INTERVENTION - 27

not have any work packages assigned on the Priority List. Two of the unscheduled pipefitters recorded 10 hours to active CACNs on their timecard, while an additional two each recorded 9 hours to active CACNs, and then took an hour of leave. The fifth pipefitter recorded 7 hours to CACN 600321, Preventative Maintenance, before leaving early.

75.    Moreover, HMIS Management was aware that the scheduled work packages would be insufficient to keep the scheduled craft employees productively occupied. At the morning meeting on May 25, 2022, FSM Maintenance Manager Eric Miller told the group that "for work today, it's a light day."

*June 27, 2022*

76.    By way of example, on June 27, 2022, Maintenance Manager Miller instructed an hourly employee that if he wasn't doing anything, he should charge the remainder of the day to 600318, the CACN for training. Several days later, Mr. Miller instructed at a morning meeting that if an hourly employee wasn't on the schedule for the day, to "just go to 320 for PM, 600320." CACN 600320 is the preventative maintenance code.

*June 29, 2022*

77.    By way of additional example, on June 29, 2022, eight electricians and nine pipefitters were identified on the FSM IT&M Priority list as working that day. On the Priority List, half of the personnel resources working had no work assigned

UNITED STATES' COMPLAINT IN INTERVENTION - 28

to them.

78.    However, as dismal as this appeared on paper, the reality was worse. The Priority List assigned two pipefitters as loaned labor to 222S for Backflow Support, and contained a single work package. When the pipefitters assigned for loaned labor reported to the facility as instructed, there was no work for them to perform so they "just sat there and bull*******." One of the pipefitters who had gone to attempt to provide Backflow Support recorded 2 hours to CACN 601586, a code for the 222S Facility, and then 8 hours to CACN 600318. The other recorded 2 hours to CACN 601586, 5.5 hours to CACN 600320, and then took 2.5 hours of leave.

79.    The one work package on the Priority List on June 29, 2022, FP-22-03723, was a corrective maintenance package to address "Glycol Leaking From Multiple Valves." However, the work package documentation indicates that no work was performed on this day, likely because the package did not have the necessary reviews and pre-work approval. The glycol leak remained unremedied for several months, as the package was not released for work until September 20, 2022. On that day, FSM personnel tried to work the package but were unable to do so at the time due to a hydrant flushing in the area. The work package was ultimately completed on September 27, 2022.

80.    Despite the near total lack of work on June 29, 2022, many hourly

employees in the FSM recorded their full ten-hour shift to active charge codes. At least 9 craft employees who did not have a work assignment for the day recorded the full ten hours to active CACNs, primarily 600318 and 600320. One of those individuals, a pipefitter, passed some of the time by watching the classic 90's film, "There's Something About Mary." Nonetheless, he recorded 10 hours to CACN 600318 on his timecard.

*July 2022*

81.    In July of 2022, Michael Winkel, the Director of Fire Systems Maintenance, instructed a pipefitter via email to use CACN 600320, the preventative maintenance code, for "downtime the remainder of the day."

82.    The above are only a few representative examples of HMIS' knowing commission and facilitation of systemic time charging fraud and HMIS management's knowledge and direction of falsely and fraudulently charging extensive and unreasonable idle time to DOE through false and fraudulent use of charging codes and inflated labor hours.

83.    The supervisors approving timecards frequently observed, were deliberately ignorant toward, or recklessly disregarded hourly workers experiencing idle time for significant portions of their scheduled shifts. They nonetheless approved timecards falsely claiming that the hourly employees had worked a full ten-hour shift with active charge codes.

UNITED STATES' COMPLAINT IN INTERVENTION - 30

84.     Once the false timecards were submitted by HMIS hourly workers and approved by a supervisor, the information on the timecard was incorporated into an invoice submitted to DOE for payment.

85.     Through this scheme, HMIS increased its revenues and profits under the Contract, while passing the costs related to the inflated hours on to the DOE. This conduct has resulted in millions of dollars of fraudulent charges for idle hourly workers for which HMIS knowingly and fraudulently claimed payment.

## VI.     FALSE CLAIMS SUBMITTED AND CAUSED TO BE SUBMITTED BY DEFENDANT

86.     Between August 17, 2020, and the present, HMIS knowingly sought and received payment for labor hours not worked by HMIS hourly employees in Fire Systems Maintenance through the invoices HMIS submitted to DOE based on false timecards completed, approved, and submitted by HMIS hourly employees and supervisors.  Moreover, HMIS knowingly claimed payment for these inflated amounts in its invoices submitted to the DOE.  Because these claims were based on knowingly false and inflated timecards, and because HMIS knowingly sought payment for work not performed and costs not recoverable under the Contract, each of HMIS' invoices between at least March 23, 2021, and the present that included FSM labor costs were false and fraudulent claims.

87.     Defendant's conduct resulted in at least the following false, fraudulent, and inflated invoices submitted by HMIS to DOE:

UNITED STATES' COMPLAINT IN INTERVENTION - 31

| Date Invoice Submitted | Target Period of Performance | Invoice # | Amount of Invoice |
|---|---|---|---|
| 3/23/2021 | 01/25/21 - 02/21/21 | HM20210502R1 | $19,910,156.25 |
| 4/5/2021 | 02/22/21 - 03/10/21 | HM20210601 | $8,743,639.27 |
| 4/24/2021 | 03/08/21 - 03/21/21 | HM20210602 | $15,046,999.24 |
| 5/13/2021 | 03/25/21 - 04/21/21 | HM20210701 | $17,858,844.48 |
| 5/27/2021 | 04/22/21 - 05/05/21 | HM20210801 | $14,686,933.70 |
| 6/10/2021 | 05/06/21 - 05/19/21 | HM20210802 | $11,863,761.80 |
| 6/24/2021 | 05/20/21 - 06/02/21 | HM20210901 | $15,695,399.18 |
| 7/8/2021 | 06/03/21 - 06/16/21 | HM20210902 | $10,397,180.87 |
| 7/22/2021 | 06/17/21 - 06/30/21 | HM20211001 | $17,535,712.65 |
| 8/5/2021 | 07/01/21 - 07/14/21 | HM20211002 | $11,816,645.92 |
| 8/19/2021 | 07/15/21 - 08/11/21 | HM20211101 | $29,581,850.86 |
| 9/2/2021 | 08/12/21 - 08/25/21 | HM20211102 | $18,077,877.04 |
| 9/16/2021 | 08/26/21 - 09/08/21 | HM20211201 | $20,083,314.42 |
| 10/1/2021 | 09/09/21 - 09/22/21 | HM20211202 | $19,504,196.67 |
| 10/28/2021 | 10/01/21 - 10/20/21 | HM20220101 | $25,393,507.10 |
| 11/11/2021 | 10/21/21-11/03/21 | HM20220201 | $16,595,742.61 |
| 11/23/2021 | 11/04/21-11/17/21 | HM20220202 | $15,508,158.64 |
| 12/7/2021 | 11/18/21-12/01/21 | HM20220301 | $14,520,130.75 |
| 12/21/2021 | 12/02/21 - 12/15/21 | HM20220302 | $14,990,249.14 |
| 1/5/2022 | 12/16/21 - 12/29/21 | HM20220401 | $19,573,784.23 |
| 1/19/2022 | 12/30/21 - 01/12/22 | HM20220402 | $14,863,319.16 |
| 2/2/2022 | 01/13/22 - 01/26/22 | HM20220403 | $17,776,730.07 |
| 2/16/2022 | 01/27/22 - 02/09/22 | HM20220501 | $14,269,463.57 |
| 3/2/2022 | 02/10/22-02/23/22 | HM20220502 | $15,962,858.56 |
| 3/16/2022 | 02/24/22 - 03/09/22 | HM20220601 | $11,031,712.19 |
| 3/30/2022 | 03/10/22 - 03/23/22 | HM20220602 | $18,829,547.51 |
| 4/14/2022 | 03/24/22 - 04/06/22 | HM20220701 | $12,942,629.39 |
| 4/27/2022 | 04/07/22 - 04/20/22 | HM20220702 | $17,345,582.03 |
| 5/11/2022 | 04/21/22 - 05/04/22 | HM20220801 | $15,786,374.56 |
| 5/26/2022 | 05/05/22 - 05/18/22 | HM20220802 | $16,116,020.88 |
| 6/8/2022 | 05/19/22 - 06/01/22 | HM20220901 | $16,399,700.04 |

UNITED STATES' COMPLAINT IN INTERVENTION - 32

| 6/23/2022 | 06/02/22 - 06/15/22 | HM20220902 | $15,673,847.08 |
| 6/23/2022 | 10/01/21 - 06/01/22 | HM20220903 | $1,499,582.85 |
| 7/6/2022 | 06/16/22 - 06/29/22 | HM20221001 | $17,765,989.05 |
| 7/20/2022 | 06/30/22 - 07/13/22 | HM20221002 | $15,360,389.16 |
| 8/3/2022 | 07/14/22 - 07/27/22 | HM20221003 | $20,591,504.38 |
| 8/17/2022 | 07/28/22 - 08/10/22 | HM20221101 | $14,757,048.26 |
| 8/31/2022 | 08/11/22 - 08/24/22 | HM20221102 | $21,791,353.41 |
| 9/14/2022 | 08/25/22 - 09/07/22 | HM20221201 | $13,347,213.52 |
| 9/29/2022 | 09/08/22 - 09/22/22 | HM20221202 | $23,713,158.04 |
| 10/26/2022 | 10/01/22 - 10/19/22 | HM20230101 | $29,139,245.19 |
| 11/9/2022 | 10/20/22 - 11/02/22 | HM20230201 | $19,336,881.23 |
| 11/22/2022 | 11/03/22 - 11/16/22 | HM20230202 | $17,603,496.46 |
| 12/8/2022 | 11/17/22 - 11/30/22 | HM20230301 | $16,527,741.88 |
| 12/21/2022 | 12/01/22 - 12/14/22 | HM20230302 | $14,678,395.17 |
| 1/4/2023 | 12/15/22 - 12/28/22 | HM20230303 | $18,485,733.49 |
| 1/18/2023 | 12/29/22 - 01/11/23 | HM20230401 | $17,423,737.52 |
| 2/1/2023 | 01/12/23 - 01/25/23 | HM20230402 | $18,346,597.15 |
| 2/15/2023 | 01/26/23 - 02/08/23 | HM20230501 | $16,328,427.92 |
| 3/1/2023 | 02/09/23 - 02/22/23 | HM20230502 | $19,314,742.42 |
| 3/15/2023 | 02/23/23 - 03/08/23 | HM20230601 | $12,028,222.32 |
| 3/29/2023 | 03/09/23 - 03/22/23 | HM20230602 | $18,655,405.27 |
| 4/12/2023 | 03/23/23 - 04/05/23 | HM20230701 | $15,589,811.33 |
| 4/26/2023 | 04/06/23 - 04/19/23 | HM20230702 | $15,058,002.12 |
| 5/10/2023 | 04/20/23 - 05/03/23 | HM20230801 | $19,038,537.62 |
| 5/24/2023 | 05/04/23 - 05/17/23 | HM20230802 | $14,505,409.85 |
| 6/7/2023 | 05/18/23 - 05/31/23 | HM20230901 | $18,694,943.93 |
| 6/21/2023 | 06/01/23 - 06/14/23 | HM20230902 | $9,586,336.42 |
| 7/5/2023 | 06/15/23 - 06/28/23 | HM20230903 | $16,880,723.61 |
| 7/19/2023 | 06/29/23 - 07/12/23 | HM20231001 | $12,657,854.53 |
| 8/2/2023 | 07/13/23 -07/26/23 | HM20231002 | $17,229,977.10 |
| 8/16/2023 | 07/27/23 - 08/09/23 | HM20231101 | $16,132,871.94 |
| 8/30/2023 | 08/10/23 - 08/23/23 | HM20231102 | $19,168,406.66 |
| 9/13/2023 | 08/24/23 - 09/06/23 | HM20231201 | $18,166,252.28 |
| 9/27/2023 | 09/07/23 - 09/20/23 | HM20231202 | $17,035,888.78 |

UNITED STATES' COMPLAINT IN INTERVENTION - 33

| 10/11/2023 | 09/21/23 - 09/30/23 | HM20231203 | $9,525,055.64 |
| 10/25/2023 | 10/01/23 - 10/18/23 | HM20240101 | $24,305,964.61 |
| 11/8/2023 | 10/19/23 - 11/01/23 | HM20240201 | $20,620,097.03 |
| 11/21/2023 | 11/02/23 - 11/15/23 | HM20240202 | $15,758,654.95 |

88.    HMIS's false time entries, statements, claims, records, and representations were material; that is, they had the tendency to influence, and were capable of influencing, DOE to provide reimbursement under the contract.  DOE would not have provided, and in fact was prohibited under the FAR and the contract from providing, reimbursement for labor hours not corresponding to work actually performed on the contract in furtherance of the statement of work.  None of the fraudulent or false charges for unreasonable and extensive idle time were eligible for federal reimbursement.

89.    HMIS's conduct further endangered the public, in that the extensive idle time was caused not by the lack of important fire protection work and preventative maintenance at the Hanford Site, but rather by HMIS's failure to appropriately and adequately plan, schedule, and carry out such work, knowing that they could simply pass the costs of HMIS's failure onto DOE and the public.  In so doing, HMIS not only fraudulently charged DOE for tens of thousands of hours of unworked time, but, just as critically, did not perform vital fire protection work that could have and should have further protected Hanford Site workers, the public, and the environment from fire hazards.

UNITED STATES' COMPLAINT IN INTERVENTION - 34

**COUNT I**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**(Against Defendant HMIS)**

90.    The United States repeats and realleges the allegations contained in Paragraphs 1 through 89 above, as if fully set forth herein.

91.    Defendant HMIS violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting or causing to be presented to the Department of Energy false and/or fraudulent claims for payment under Government Contract No. 89303320DEM000031.

92.    The United States paid the false and/or fraudulent claims because of Defendant's acts and incurred damages as a result.

93.    Pursuant to 31 U.S.C. § 3729(a), Defendant HMIS is liable to the United States Government for a civil penalty of not less than $13,508 and not more than $27,018, for each violation of the False Claims Act committed by Defendant.

94.    Pursuant to 31 U.S.C. § 3729(a), Defendant HMIS is liable to the United States for three times the amount of damages sustained by the United States because of Defendant's conduct.

**COUNT II**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**
**(Against Defendant HMIS)**

95.    The United States repeats and realleges the allegations contained in Paragraphs 1 through 94 above, as if fully set forth herein.

UNITED STATES' COMPLAINT IN INTERVENTION - 35

96.    Defendant HMIS violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used, false records or statements that were material to false and/or fraudulent claims for payment to the Department of Energy, and which claims the United States did pay.

97.    The United States paid the false and/or fraudulent claims because of Defendant's acts and incurred damages as a result.

98.    Pursuant to 31 U.S.C. § 3729(a), Defendant HMIS is liable to the United States Government for a civil penalty of not less than $13,508 and not more than $27,018, for each violation of the False Claims Act committed by Defendant.

99.    Pursuant to 31 U.S.C. § 3729(a), Defendant HMIS is liable to the United States for three times the amount of all damages sustained by the United States because of Defendant's conduct.

**COUNT III**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**
**(Against Defendant HMIS)**

100.    The United States repeats and realleges the allegations contained in Paragraphs 1 through 99 above, as if fully set forth herein.

101.    Defendant HMIS violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), by knowingly making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money or property

UNITED STATES' COMPLAINT IN INTERVENTION - 36

the United States, or by knowingly concealingly or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the United States.

102. The United States incurred damages as a result of Defendant's acts.

103. By knowingly retaining overpayments associated with extensive and unreasonable idle time for which HMIS improperly obtained payment, HMIS is liable under 31 U.S.C. § 3729(a)(1)(G).

104. *See, e.g., United States ex rel. Prather v. Brookdale Senior Living Communities*, 838 F.3d 750 (6th Cir. 2016) (knowing retention of an overpayment is sufficient to state a reverse false claim violation); *see also United States ex rel. Joest v. Loral Corp., No. CV 96-5554* (C.D. Cal. Aug. 13, 2002) (contractor's known retention of overpayments and use of false statements and omission of material information sufficient to create "reverse" false claims liability).

105. Pursuant to 31 U.S.C. § 3729(a), Defendant HMIS is liable to the United States Government for a civil penalty of not less than $13,508 and not more than $27,018, for each violation of the False Claims Act committed by Defendant.

106. Pursuant to 31 U.S.C. § 3729(a), Defendant HMIS is liable to the United States for three times the amount of damages sustained by the United States because of Defendant's conduct.

**COUNT IV**
**Breach of Contract**
**(Against Defendant HMIS)**

107. The United States repeats and realleges the allegations contained in

UNITED STATES' COMPLAINT IN INTERVENTION - 37

Paragraphs 1 through 106 above, as if fully set forth herein.

108.   Without excuse, Defendant HMIS materially breached its contract with the Department of Energy by: (1) failing to implement adequate controls to ensure that labor was properly charged to Government Contract No. 89303320DEM000031; and (2) overbilling under Government Contract No. 89303320DEM000031 for labor hours not actually worked by HMIS personnel.

109.   Defendant HMIS' breach of its contract caused damages to the DOE, and Defendant is liable to the United States in the amount of the damages caused by its breach.

## **PRAYER FOR RELIEF**

110.   WHEREFORE, Plaintiff United States of America prays for judgment against the Defendant, as follows:

A. As to Counts I, II, and III under the False Claims Act, 31 U.S.C. § 3729(a), against Defendant HMIS for treble the amount of the United States' single damages to be proven at trial, plus civil penalties as are required by law per violation of the False Claims Act, post-judgment interest, costs, and such other relief as may be necessary and proper;

B. As to Count IV, breach of contract, against Defendant HMIS, for the amount of damages sustained by the United States as a result of Defendant's breach of contract, to be proven at trial, plus pre-

UNITED STATES' COMPLAINT IN INTERVENTION - 38

1    judgment and post-judgment interest, and costs; and

2    C.  Such other relief as the Court deems just and proper.

3
     The United States demands a trial by jury as to all issues so triable.
4

5                           Vanessa R. Waldref
                            United States Attorney
6

7                           _____

8                           Frieda K. Zimmerman
                            Dan Fruchter
9                           Molly M.S. Smith
                            Assistant United States Attorneys
10                          United States Attorney's Office for the
                            Eastern District of Washington
11                          920 W. Riverside Avenue, Suite 340
                            Post Office Box 1494
12                          Spokane, WA 99201-1494
                            Telephone:  (509) 353-2767
13                          Frieda.zimmerman@usdoj.gov
                            *Counsel for the United States of America*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     UNITED STATES' COMPLAINT IN INTERVENTION - 39

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 24, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

SMITH & LOWNEY, PLLC
**Meredith A. Crafton**          **Via CM/ECF System:**
**Knoll D. Lowney**              meredith@smithandlowney.com
                                 **Via CM/ECF System:**
                                 knoll@smithandlowney.com

HANFORD CHALLENGE
**Nikolas F. Peterson**          **Via CM/ECF System:**
                                 nikolasp@hanfordchallenge.org

MEHRI & SKALET, PLLC
**Richard E. Condit**            **Via CMF/ECF System:**
**Cleveland Lawrence III**       rcondit@findjustice.com
**Autumn Clarke**                **Via CMF/ECF System:**
                                 clawrence@findjustice.com
                                 **Via CMF/ECF System:**
                                 aclarke@findjustice.com


_____
Frieda K. Zimmerman
Assistant United States Attorney

UNITED STATES' COMPLAINT IN INTERVENTION - 40